# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**LINQ INDUSTRIAL FABRICS, INC.,**

     **Plaintiff,**

**v.**                                    **Case No.  8:03-cv-528-T-30MAP**

**INTERTAPE POLYMER CORP. and
INTERTAPE POLYMER MANAGEMENT
CORP.,**

     **Defendants.**

_____

# <u>ORDER</u>

THIS CAUSE comes before the Court upon Defendants' Dispositive Motion for Summary Judgment (Dkt. #52), Plaintiff's opposition (Dkt. #65) thereto, Plaintiff's Dispositive Motion Dismissing Defendants' Inequitable Conduct Defense (Dkt. #49), and Defendants' response (Dkt. #64) thereto.  After review of the briefs and hearing oral argument from the parties, the Court determines that Defendants' Motion for Summary Judgment should be DENIED and Plaintiff's Dispositive Motion Dismissing Defendants' Inequitable Conduct Defense should be GRANTED.

In their Motion for Summary Judgment, Defendants argue the patents in question are invalid because:

1)      they do not comply with 35 U.S.C. § 112, which requires that the specification in the patent:

      a)      "enable any person skilled in the art to which it pertains . . . to make and use the same;" and

      b)      "set forth the best mode" contemplated by the inventor of carrying out his invention, and

2)      Plaintiff Linq's inequitable conduct voids the patents.

## **ENABLEMENT**

A valid patent specification must be written in "terms as to enable any person skilled in the art to which it pertains or with which it is most nearly connected, to make and use the same." Enzo Biochem, Inc. v. Gen-Prope, Inc., 323 F.3d 956, 963 (Fed. Cir. 2002). Defendants argue that the term "quasi-conductive" used by the inventor to describe some of the filaments used in its bag is a term created by Linq and has meaning only in the context of a "full-scale bag" test, but no description exists in the patent for conducting a "full-scale bag" test. Additionally, Defendants argue that the '154 specification is lacking in any disclosure as to how one would select a "quasi-conductive fiber."

Contrary to Defendants' assertion, it is not necessary for the patent to describe the details of a full-bag test to understand the meaning of a "quasi-conductive fiber." The patent is sufficiently clear to convey an ascertainable meaning to someone of ordinary skill in the

art.  While the Special Master in this case, Stephen Rubin, Esquire, did not resolve this enablement issue,[1] he did explain at page 31 of his report how someone of ordinary skill in the art would understand the term "quasi-conductive" and be able to use the invention:

> In view of the ambiguity introduced by the specification, it is helpful to review the teaching of prior art made of record in the prosecution history, and to evaluate available extrinsic evidence within the guideposts provided by *Phillips* to determine what, if anything, the disclosure of the '154 patent, as so amplified, would inform a person of ordinary skill in the art at the time of the invention as to the meaning of "quasi-conductive fiber."

> A person of ordinary skill in the relevant art at that time would understand the degree of conductivity required to "size and shape" quasi-conductive fiber filaments to achieve corona discharge at corona discharge points.  There is substantial prior art in the record of this case, including prior art made part of the prosecution history, to support this conclusion.  By identifying an antistatic fiber product of DuPont to be "quasi-conductive," the '154 patent inventors reveal that they did not restrict their own research to fibers that have a known application to FIBCs.  Others skilled in the art at this time can be presumed to act similarly.  *See* Phillips, 415 F.3d at 1314 (inventors typically persons skilled in the art).

> Also, "[o]ne of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case."  *Phillips*, 415 F.3d at 1323.  Although the DuPont P-70 product may be misidentified in the specification, the DuPont NEGA-STAT brochure included the prosecution history and the specification disclosure threshold voltage for corona discharge would provide important information about the characteristics and possible source of this example of a quasi-conductive fiber.

> The ability to establish corona discharge in a variety of different fibers using a broad range of fiber structures would enable an ordinarily skilled person to set the upper limit of conductivity for a "quasi-conductive" fiber.  To set the lower limit of "resistivity" it would be necessary for an ordinarily skilled person to engage in controlled tests to determine the point at which

---

[1] Note 86 on page 31 of report.

incendiary discharges would be avoided in combustible atmospheres having an MIE of 0.25mJ.

The parties agree that such testing is required to establish a fiber is quasi-conductive.  At the time of the invention, several tests of varying efficacies existed to determine the static dissipative properties of fabrics and fibers.  Intertape has attached as an exhibit to its brief a paper authored by N. Wilson and presented on September 28, 1989, entitled "The Electrostatic Spark Discharging Behavior of Some Flexible, Intermediate Bulk Containers." In addition to describing the state of the art of FIBC static dissipation at this time, the author describes a test using flammable vapors.  The test measures the capacitance of conducting threads woven into a FIBC fabric in the incidence, at different thread capacitances, of an incendiary type discharge in atmospheres with a defined MIE.  A somewhat similar "charge" test appears to have been employed by Mr. Pappas, a co-inventor, in describing the differences between existing antistatic fabric and the novel fabric of the invention.  Such a test is also disclosed in the Samuelson '185 patent.  There was also a "static decay" test in existence at the time that measures the electrical resistance of static dissipative materials by means of a national standard.  The DuPont NEGA-STAT brochure supports use of the static decay test, but notes its limitations.

The record shows that a two-part "full-scale FIBC" test was employed by the inventors to ascertain whether a fiber met the "quasi-conductive" standard.  The necessary resistivity of the fiber was determined by the electrostatic charging of the container's contents and then approaching the fabric surface of the container with a gas probe in the effort to induce an incendiary discharge in a combustible environment of 0.25mJ.  Mr. Pappas, the co-inventor, explained: "You would examine a particular fiber for corona discharge properties, and then to determine if you have incendiary discharges from the ends of the fiber, you would perform a full-scale FIBC test." However, this test appears to have little known at the time of the invention and still is not accepted as a standard in the industry.

On balance, the extrinsic evidence of tests available to persons skilled in the art to ascertain antistatic fiber resistivity does not contribute to the definition of "quasi-conductive fibers."  The need for any such test is not mentioned in the claims, specification or prosecution history.  To import an undisclosed test requirement into the claim definition in these facts would be improper.  *See Liebel-Flarsheim Co. v. Medrad, Inc., supra*, 358 F.3d at 910. As noted, the  tests were not widely accepted or practiced at the time of the

invention.  <u>Finally, and most importantly, such testing is unnecessary to understand the meaning of "quasi-conductive fiber" as intended by the patentees.</u>

The intrinsic evidence, while not without the limitations mentioned before, does provide sufficient disclosure to support a definition of "quasi-conductive fiber" that includes an upper range of conductivity to effect corona discharge and a lower range of conductivity (higher resistance) to avoid incendiary discharge in combustible environments of 0.25mJ.  The structure of the quasi-conductive fiber is disclosed, including a preferred embodiment in Figure 3.  The requirement that the fiber have corona discharge at the discharge points.  As has been said, the upper measure of conductivity required to effect corona discharge was well-known at the time by persons ordinarily skilled in the art.  The specification teaches that too much conductivity might result in incendiary discharges in ungrounded flexible fabric containers.  The Pappas '699 patent and the Samuelson '185 patent, which the patentees distinguished during prosecution, use highly conductive fibers to achieve static dissipation.  The specification shows that by reducing the conductivity of a component of the quasi-conductive fiber, such as the sheath in the preferred embodiment, the resultant fiber avoids incendiary discharge in a defined combustible environment.

Accordingly, I recommend adoption of this construction: quasi-conductive fibers are composed of filaments that are sized and shaped to effect corona discharges at corona discharge points while having a resistance to avoid discharges at the ends and along the length of the filaments at a rate that would result in an incendiary type of discharge in a combustible environment of 0.25mJ.  (Emphasis supplied.  Footnotes omitted.)

## **BEST MODE**

Defendants' second argument is that the LINQ patents' specification does not set forth the best mode contemplated by the inventor of carrying out his invention.  Defendants even go a step further and argue that the inventors engaged in systematic behavior to hide the best mode.

Section 112 requires the patent specification to "set forth the best mode contemplated by the inventors of carrying out his invention."  The purpose of this requirement is to "restrain inventors from applying for patents while at the same time concealing from the public preferred embodiments of their invention which they have in fact conceived." Transco Products, Inc. v. Performance Contracting, Inc., 38 F.3d 551, 560 (Fed. Cir. 1994). Here, the patent sufficiently described the product and there is no evidence of any attempt to "hide" the best mode.

The '154 patent discloses a fiber made by DuPont that can be adapted for use as a quasi-conductive fiber.  In the patent application it is labeled as a DuPont P-70 fiber.  While DuPont did not make a P-70 fiber, there is at least a disclosure that DuPont makes a fiber with the properties described in the patent that is the best one tested by the inventor at the time of the patent.  DuPont refers to the fiber as P-190 and by the name of Nega-Stat®.

The '154 patent describes the essential structure of a Nega-Stat® fiber and further discloses an example with a multilobal conductive core and insulating sheath material. Further, the patent gives an electrical resistivity number and explains that the fiber has a corona discharge which also is a characteristic of Nega-Stat®.  These disclosures are sufficient.

In addition, Linq claims that a simple call to DuPont would immediately lead the caller to the fiber in question, to wit: the Nega-Stat® fiber.  While that may be a disputed issue of fact, it is another reason a motion for summary judgment must be denied as to this issue.

## INEQUITABLE CONDUCT

For its third argument in support of their Motion for Summary Judgment, Defendants assert that Linq committed fraud on the patent office by failing to discharge its duties of disclosure as required by 37 CFR §1.56. This issue, also the subject of Linq's Dispositive Motion Dismissing Defendants' Inequitable Conduct Defense (Dkt. #49), arises from the requirement found in 37 CFR §1.56(a) which provides:

> A patent by its very nature is affected with a public interest. The public interest is best served, and the most effective patent examination occurs when, at the time an application is being examined, the Office is aware of and evaluates the teachings of all information material to patentability. Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section.

A breach of the duty to prosecute a patent with candor, good faith, and honesty, when coupled with an intent to deceive or mislead the Patent and Trademark Office constitutes inequitable conduct, which renders the patent unenforceable. Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc., 326 F.3d 1226, 1233 (Fed. Cir. 2003).

Defendants contend Plaintiff Linq misled the patent examiner by failing to tell the examiner that its product was the same as an earlier Samuelson invention. Defendants further argue that Linq's "quasi-conductive" fibers were the same as the fibers previously developed by DuPont, but which DuPont referred to as "conductive" fibers.

These contentions by Defendants came late in the game. Linq filed its Amended Complaint on July 31, 2003. Defendants responded with their Answer, Affirmative Defenses

and Counter-Claims on August 21, 2003, raising their inequitable conduct defense in their

Fifth Affirmative Defense which states:

> The patents-in-suit are unenforceable because of Plaintiff's fraud on the United
> States Patent and Trademark Office during prosecution of the patents-in-suit.

Linq sought the facts supporting Defendants' inequitable conduct defense by

interrogatory. Defendants' interrogatory response was:

> Plaintiff's burial of relevant prior art references among its disclosures of prior
> art to the Patent and Trademark Office ("PTO"), together with its
> mischaracterization of prior art references, constitute a violation of 37 CFR
> §1.56, which requires a duty of candor and good faith in dealing with the
> PTO.

Defendants fail to set forth any specific facts to support this defense. The parties dispute

whether Defendants' witnesses were any more specific on deposition.

Inequitable conduct renders a patent unenforceable when there is "evidence of

affirmative misrepresentation of a material fact, failure to disclose material information, or

submission of false material information, coupled with an intent to deceive." Ulead Sys., Inc.

v. Lex Computer and Management Corp., 351 F.3d 1139, 1144 (Fed. Cir. 2003). Since a

finding of inequitable conduct eliminates all of the patentees' rights and the professional or

commercial reputation of the patentee could be seriously damaged, such consequences

demand "a heavy burden of persuasion." University of Florida Research Foundation, Inc.

v. Orthovita, Inc., 1998 WL 34007129 at *33 (N.D. Fla. 1998). None of Defendants'

evidence rises to the level necessary to meet this "heavy burden of persuasion" by clear and

convincing evidence.

Defendants' contention that Linq hid or misstated the existence of the prior Samuelson and DuPont products is refuted by the patent application itself. During the prosecution of the '154 patent, the examiner originally rejected a claim of the application as obvious, in part, because of the earlier Samuelson patent. The examiner was well aware of the existence of the Samuelson patent and the product described therein. The examiner observed that the Samuelson patent disclosed a fiber, like the one described in the patent application, comprised of a conductive core and an insulating sheath. The patentees overcame this initial rejection by pointing out that the Samuelson patent had no teaching about the use of these fibers to avoid incendiary discharges in combustible environments. The Samuelson patent only disclosed the use of the fibers in clean rooms.

Likewise, the patent application referred to the existing DuPont fiber as being one sufficient to create the product in the application. While the DuPont product was misidentified, the patentee disclosed that such a fiber was in existence and had been previously developed by DuPont. That disclosure belies any intent to deceive the patent examiner about the existence and properties of the DuPont fiber.

There is nothing wrong with obtaining a patent for combining pre-existing technology into a new product. Inventions typically are new combinations of existing principles or features. Ruiz v. A. B. Chance Co., 357 F.3d 1270, 1275 (Fed. Cir. 2004).

For these reasons, not only should Defendants' Motion for Summary Judgment be denied, but Linq's Motion to Strike Intertape's Fifth Affirmative Defense should be granted.

It is therefore ORDERED AND ADJUDGED that:

1.   Defendants' Dispositive Motion for Summary Judgment (Dkt. #52) is
     DENIED.

2.   Plaintiff's Dispositive Motion Dismissing Defendants' Inequitable Conduct
     Defense (Dkt. #49) is GRANTED.

3.   This case remains scheduled for Pre-Trial Conference on  <u>WEDNESDAY,
     MARCH 1, 2006, AT 8:45 A.M.</u> in Courtroom #13A, Sam Gibbons U.S.
     Courthouse, 801 North Florida Avenue, Tampa, Florida, 33602, and is set for
     Jury Trial during the calendar month of APRIL 2006.

**DONE** and **ORDERED** in Tampa, Florida on January 31, 2006.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Even\2003\03-cv-528.msj 52.frm